IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHERI LEE FORSTEIN,

              Petitioner,                     No. CIV-S-03-0544 FCD GGH P

    vs.

GLORIA HENRY, et al.,

              Respondents.           FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

        Petitioner, Cherie Lee Forstein, was convicted of first degree murder as a "principal;" however, it is undisputed that petitioner was not the actual shooter of the victim. Rather her "principal" status revolved about three separate prosecution theories: (1) she aided and abetted the murder of the victim by soliciting such murder and bringing the shooter to her residence location; (2) she aided and abetted the murder of the victim by soliciting the victim's assault with the murder being the natural and probable consequence of the assault; and (3) she conspired with the shooter to murder or assault the victim with the murder being the natural and probable consequence of the conspiracy.

        The primary issue in this petition is sufficiency of the evidence. After personally reading the entire evidentiary portion of the trial, the undersigned finds under applicable

1

1  standards that the evidence was indeed sufficient.  The remaining issue, that of jury

2  "misconduct," and the trial court's investigation into such misconduct, lacks merit.  Accordingly,

3  the petition for habeas corpus should be denied.

4  *Facts*[1]

5         Petitioner, respondent and the state Court of Appeals have all given renditions of

6  the facts.  For purposes of these Findings, the undersigned will use much of petitioner's factual

7  statement with significant supplementation and reorganization.

8         It is perhaps best to commence these Findings with a cast of the important

9  witnesses:

10 Petitioner – Cheri Lee Forstein

11 Chad Howard – son of petitioner and Curtis Howard

12 Curtis Howard – Trigger Puller

13 James Stringer – Aided Curtis Howard in the murder

14 Wanda Frazier – Mother of victim

15 LaMarr Morris – son of Wanda Frazier and Howard Morris Sr.

16 Howard Morris Jr. – the victim (deceased older brother of LaMarr)

17 Shirley Hamilton – neighbor who saw aftermath of the shooting

18 Keith Hodges – neighborhood boy

19 Karee.– neighborhood boy

20  Raheem – neighborhood boy

21 Akan – neighborhood boy

22 _____

23     [1]  The reporters transcript in this case is oddly organized.  One expando folder contains
   "Volume One, Pages 1 to 297," and "Volume Two, Pages 298-466."  These two volumes deal
24 only with jury selection.  However, there is another "Volume One, Pages 1-276," and "Volume
   Two, Pages 277-576."  The latter Volume One deals with motions and other matters before the
25 court; Volume Two continues in this vein, but opening statements then appear, and finally, the
   presentation of evidence. RT 433.  For the purposes of this case, the jury selection Volumes One
26 and Two are irrelevant, and will not be considered.

1   Skate – neighborhood boy

2   Frank Munoz – petitioner's employer

3   Dean Madeiros – worked on petitioner's car

4   Kristin Davis – neighbor

5   Edna Finch – neighbor

6   George Taylor – neighbor

7   Carlos Simpson – neighbor

8   Donald Finch – neighbor

9   Robert Price – neighborhood security officer (guard shack)

10          In 1999, petitioner, her son (Chad), and Wanda Frazier and her sons, LaMarr and

11   Howard Morris, Jr. lived in Franklin Villa, a neighborhood of fourplexes.  Petitioner met the

12   Frazier/Morris family when her son Chad began to play with the younger Morris – LaMarr.

13   Things were fine until LaMarr and Chad had an altercation which ultimately resulted in Chad

14   either macing (includes pepper spray) or attempting to mace LaMarr.  The two mothers

15   confronted each other, but with the result that petitioner apologized and commented that she did

16   not feel comfortable in the neighborhood.  Wanda Frazier believed the issue to be more or less

17   resolved.

18          Evidently, petitioner did not.  On or about September 20, 1999, petitioner was

19   seen by a neighbor (Finch) throwing LaMarr against a tree.  According to LaMarr, petitioner

20   stated that Chad's father (Curtis Howard) was a bail bondsman and had people who would kill

21   for him, and that "One-eyed Jimmy would come down and kill him, or harm other members of

22   LaMarr's family.  During that altercation, petitioner directed Chad to "go in and get the gun"

23   which Chad did, but the gun appeared to be either a toy gun, or a pellet (air) gun of some sort.

24   Chad also had his "mace" in his other hand.

25          Keith Hodges remembered that he and LaMarr were coming home from school on

26   September 20, when LaMarr, angry at Chad for the macing incident, began to chase Chad.

Ultimately, LaMarr was stopped by petitioner.  LaMarr said to Chad, "I'm tired of you."
Petitioner loudly said, "I'm tired of you black niggers disrespecting my house."  RT 1227.  At
one point, petitioner asked Chad to get the phone.  After Chad dialed a number, he handed the
phone to his mother (petitioner) and she was heard to say: "I got a job for you, come here as soon
as possible, I need you to get rid of these two black niggers, not you Keith."  RT 1229.
According to Wanda Frazier, petitioner later went over to Frazier's house and again apologized.

At various times, other persons overheard petitioner issue threats against the
Frazier family.  Maderios (petitioner's mechanic) repeated what petitioner had said about her
problems in the neighborhood – "she was going to have her problems dealt with."  She
referenced  RT 831  832 – that her "old man" and one of her friends was going to take care of it.
Petitioner's former employer, Frank Munoz, heard petitioner say that she was "going to bring
some muscle" to help solve her problems.  RT 1142.  Although he attributed it to blowing off
steam, George Taylor, a neighbor, related that petitioner said that "she could have them killed"
RT 1304; she spoke of a "one-eyed Jimmy" who was "going to kill that fucking bitch (Frazier)."
RT 1325.  Security guard Price overheard petitioner say to LaMarr's and the victim's father
(Howard Morris Sr.) that "I get my fellows to come down here and teach you niggers
something."  RT 1780-81.  Price also heard petitioner refer to a one-eyed thug, but this time it
was a "one eyed Willie."

Chad's father, Curtis Howard, was indeed a bail bondsman residing in the San
Francisco Bay Area.  He had maintained a very short relationship with petitioner which
nevertheless resulted in a child (Chad).  At one point, Curtis Howard was compelled to get a
restraining order against petitioner due apparently to petitioner's outbursts.  The restraining order
included a provision that petitioner was not to phone Howard, but when Chad's difficulties with
LaMarr arose, she began to call and berate him for allowing his child to live in danger.  On the
September 20th incident day, petitioner left for the Bay Area with Chad.  Petitioner and Chad
stayed with Curtis Howard.  While the precise conversations that petitioner had with Curtis

1    Howard will not be known, co-defendant Howard and Stringer drove back in caravan to

2    petitioner's complex on September 22.   The two men were armed, and at least one carried a law

3    enforcement badge.

4              When the two cars entered the complex, the security guard (Price) let the car with

5    Howard and Stringer in without checking on account of their identification to him as police

6    officers.   All proceeded to the location of petitioner's residence.   The evidence is conflicting, but

7    at a later time, petitioner came out of the house, saw LaMarr, grabbed his head, and said: "look at

8    what [you got yourself] into."   RT 550.   After leaving LaMarr, Curtis Howard and Stringer, who

9    were watching this from their parked vehicle, left the vehicle and approached LaMarr.   The two

10   men pulled their guns, and at least one was stuck into LaMarr's side.   Curtis Howard told LaMarr

11   that he was "going to kick his F'ing teeth in."   RT 553-554.   As LaMarr began to walk away,

12   Stringer grabbed LaMarr's left hand and smashed it against an object, probably a mailbox,

13   thereby breaking a bone in LaMarr's hand.   LaMarr believed that the men were going to find and

14   attack LaMarr's brother and father.

15             At some point afterwards, Chad had told his neighbor, Edna Finch, not to go

16   outside because there was going to be trouble.   Donald Finch related that *petitioner* had told him

17   that he should go into his house, because "some things were going to come down."   RT 1431.

18             Soon after LaMarr was injured, and his attempt to have a police officer help him

19   had failed, word spread to his older brother Howard Morris Jr ("Morris, Jr."), the ultimate victim,

20   about what had happened.   Morris Jr. became very angry, and he along with LaMarr and other

21   boys went to LaMarr's and Morris. Jr.'s home.   Morris Jr. acquired a baseball bat there and

22   declared that "You [meaning Curtis Howard, Stringer and others] shouldn't be F'ing with my

23   family."   RT 754.   LaMarr was able to get the bat from Morris. Jr., and he, along with a friend,

24   otherwise tried to restrain his older brother, but to no avail.   Morris. Jr. was off to look for the

25   assailants – and he found Curtis Howard, who along with Stringer, had been more or less

26   "patrolling" the approximate area around petitioner's house.   Morris, Jr. approached Curtis

5

1   Howard; the witnesses vary in their rendition of what might have been said by Morris, Jr.  At

2   least one person heard Morris, Jr. ask Curtis Howard "where is she at?" whereupon Curtis

3   Howard shot Morris, Jr.  Curtis also responded at the same time: "There she is."  When Morris

4   Jr. struggled to get up, Curtis Howard shot him again.  One witness heard Curtis Howard declare

5   after the second shot: "that's what you get, that's what you deserve."  RT 1061.  A crowd

6   gathered, but Curtis Howard would not permit anyone to get close to Morris, Jr., even though he

7   apparently was still alive at the time.  Petitioner was not in the area during the murder.

8          Soon enough, police officers arrived and took Curtis Howard into custody.

9   Howard said a few things whose inferences were adverse to petitioner, i.e., the statements tended

10  to show that petitioner had instigated and facilitated the murder: "People need to be getting killed

11  on this corner for trying to hurt my son, all those people need to get a life."  RT 1354.  At the

12  police station, Howard also said he would not hurt the officer because the officer had done

13  nothing to Howard and "I did what I came here to do and I'm done."  RT 1356.

14         Petitioner's defense had petitioner's son Chad being the person who told his father

15  what was happening at his housing complex, including the fact that he had seen Morris, Sr. (prior

16  to the murder day) take a gun from his car and hide it in his clothing.  Chad asked his father to

17  help them move out of the complex, and that was the purpose of his coming to Sacramento. (No

18  objective, corroborative evidence was presented that showed petitioner and her son had actually

19  made plans to move anywhere.)  Petitioner thought only that Curtis Howard would follow them

20  just to make sure that petitioner and her son made it home alright.  Confronted with the fact that

21  petitioner had been tape recorded in her urging for Howard to do something to protect his son,

22  and the undeniable epithets and threats-to-kill or hurt uttered by petitioner, the defense theory

23  was, and is here now, that petitioner was simply one to angrily erupt, but just as quickly to cool

24  down, i.e., the threats could not be taken seriously.

25  \\\\\

26  \\\\\

6

1   *Standard of Review*

2           In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

3   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

4   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

5   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

6   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

7   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

8   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

9   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

10          "Unreasonable application" of established law, on the other hand, applies to

11  mixed questions of law and fact, that is, the application of law to fact where there are no factually

12  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

13  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

14  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

15  deference is not blindly automatic, "the most important point is that an *unreasonable* application

16  of federal law is different from an incorrect application of law....[A] federal habeas court may not

17  issue the writ simply because that court concludes in its independent judgment that the relevant

18  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

19  that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

20  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

21  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

22  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

23          The state courts need not have cited to federal authority, or even have indicated

24  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

25  Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

26  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The above standards are commonly applied to all issues in federal habeas, and insufficiency of the evidence is no different. One might argue that the definition is already so strict, that no reasonable jury could convict on the evidence, see below, that no further filters of review need be employed. However, that is not the law, i.e., § 2254 does not except sufficiency of the evidence questions from its purview. The Ninth Circuit has recently so held in Juan H. V. Allen, ___F.3d___, 2005 WL 1301570 (9th Cir. June 2, 2005).

*The Merits*

        1. Insufficient Evidence

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas. Adamson v. Ricketts, 758 F.2d

441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could have reached the same conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable trier of fact could have found the conviction scenario beyond a reasonable doubt.

> In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986).  *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.*  United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

The Court of Appeals identified possible theories for petitioner's guilt of first degree murder, but ruled on only one of them – aider and abettor with intent to commit the offense of conviction.  See Answer at Exhibit B (Court of Appeals opinion).  The appellate court determined that there were two types of aider and abettor liability under California law: (1) that the aider and abettor "acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the

1  offense;'" or (2) an aider and abettor may intend to assist the perpetrator in an underlying crime,

2  but is also guilty of any offense which is the natural and probable consequence of the crime aided

3  and abetted.  The Court of Appeals focused on the first aider and abettor circumstance, and held:

4  "The record supports the inference Forstein knew Howard intended to kill the people she

5  described as threatening Chad at Franklin Villa, and gave aid and encouragement to him in

6  committing the intended crime."  Opinion at 12.  Specifically:

7           Numerous witnesses recounted Forstein's threats to bring people
          from San Francisco to kill LaMarr and his family.  Forstein
8           telephoned Howard on September 20, 1999 saying: "I got a job for
          you, come here as soon a s possible, I need you to get rid of these
9           two black niggers...."  Forstein drove to San Francisco the same
          day, stayed with Howard, and returned with him and Stringer two
10          days later to carry out the plan using the handguns they brought
          with them.  Forstein also assisted by pointing out LaMarr to
11          Howard and Stringer.  The jury could infer that the assault on
          LaMarr was intended to provoke a response from his family.  After
12          Howard's arrest, he told Officer Galipeau, "I did what I came here
          to do and I'm done."

13 Id.

14

15          The question in this habeas case is whether the appellate court was AEDPA

16 unreasonable in determining that a reasonable jury could have made the inferences stated.  The

17 answer is, no.  The undersigned emphasizes the numerous specific *murderous* threats directed at

18 the victim's family as did the Court of Appeal.  Also, petitioner's family's warnings to the

19 Finches to, in essence, take cover, bespoke more than just some roughing up of LaMarr and his

20 family.  Howard's and Stringer's ruse to gain entrance to the complex told of planning.  Howard

21 and Stringer's trolling for more victims after smashing LaMarr's hand supports the Court of

22 Appeals' belief that a jury could have inferred the plan to inflame a family member so that

23 Howard and or Stringer would be "justified" in defending themselves while they harbored the

24 intent at all times to kill at least one family member.  Howard not only told a police officer that

25 he had finished what he had come to do (after the killing of Morris, Jr.), but that Morris, Jr. "got

26 what he deserved."  The jury could infer from the second shot that Curtis Howard had always

1  intended to kill a member(s) of LaMarr's family by virtue of Curtis Howard's stone cold second

2  shot after Morris, Jr. was struggling to get up.  Further, Curtis Howard's threats to the crowd not

3  to assist the near dead Morris, Jr. also bespeaks murderous intent.  And, because of petitioner's

4  expressed desires to have members of LaMarr's family killed, she was tarred with Howard's

5  expressed intent when the deed was done.

6        Of course, it is theoretically possible to construct from the evidence that petitioner

7  was a blowhard, and all she thought would happen was a little roughing up of LaMarr and his

8  family.  It is further possible that the killing ultimately came as an unexpected act to petitioner.

9  The guns carried by Howard and Stringer may have been initially intended only for defensive

10  purposes, and the change in intent was never conveyed to petitioner.  But, these are all

11  hypotheses that the prosecution does not have to expressly disprove in hindsight – so long as

12  evidence existed from which the jury could find beyond a reasonable doubt that petitioner was

13  ever a part of an intended murderous plan – that is sufficient for this review to deny the claim.

14  The jury did not have to accept at full value certain witness testimony that they did not believe

15  petitioner serious when she made threats.

16        Moreover, there was no need for petitioner to have continuous, unrelenting intent

17  to kill a member of LaMarr's family, if she knowingly put in motion the actions of others with

18  respect to murdering Howard Morris Jr. – she is guilty regardless of whether she had murderous

19  intent on her mind at all times, or whether she had later cooled down.  Evidence before the jury

20  demonstrated that petitioner was facilitating the acts of Howard/Stringer nearly up to the point of

21  the murder.  Assuming that the jury could legitimately infer petitioner's murderous intent from

22  her prior statements, and that she instigated the murderous intent of Howard, the fact that she

23  may at some time later, when she cooled down, have silently believed that Howard and Stringer

24  would simply rough up LaMarr's family does not cure petitioner's earlier aiding and abetting.

25  Even assuming that this scenario were the actual facts, there is no evidence that petitioner did

26  anything to stop the murder process which she had started.  See People v. Cooper, 53 Cal. 3d

1   1158, 1164, 282 Cal. Rptr. 450, 455 (1991): "A person aids and abets the commission of a crime

2   when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the

3   intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act

4   or advice, aids, promotes, encourages or *instigates* the commission of the crime;" People v. Null,

5   157 Cal. App. 3d 849, 204 Cal. Rptr. 580 (1984) (Landowner who knew her property was being

6   used for cultivation of marijuana was an aider and abettor when she took no steps to terminate

7   the illegal activity on her land.)

8          The undersigned has thoroughly reviewed Juan H., supra, in arriving at his

9   conclusion.  In that habeas case, where the crime at issue was also aiding and abetting a murder,

10  the Ninth Circuit found that insufficient evidence existed.  However, the aider and abettor in that

11  case truly had no established, concrete connection with the intent of the trigger man.  The sole

12  evidence produced by the prosecution in Juan H was the fact that two months earlier the aider

13  and abettor had flashed gang signs at the victim, was at the scene of the murder with the trigger

14  person, standing behind the trigger person, and after the murder, ran away to his house.   The

15  appellate court was found to have acted unreasonably in determining that sufficient evidence

16  existed for a jury to infer that Juan H. shared the murderous intent of the trigger person.  In this

17  case, however, petitioner was overheard on numerous occasions expressing her desire that death

18  befall the victim's family members, and petitioner actively participated in the events transpiring

19  on the murder day.  The Court of Appeal in this case could find that a reasonable jury could infer

20  the intent to murder the victim.

21         Oftentimes, one person's "inference" can be another person's "speculation," and

22  that some reasonable advocates, such as petitioner's counsel, could fairly argue that the found

23  intent of the defendant trio, including petitioner, to set-up a murder by using LaMarr's injury as

24  bait was somewhat speculative, it is true that reasonable persons could have found otherwise

25  based on the evidence in this case.

26  \\\\\

1    The court finds that the state Court of Appeal was not unreasonable in the

2  AEDPA sense when it determined that sufficient evidence existed to convict petitioner on an

3  aiding and abetting theory.[2]

4    2.  Juror Misconduct

5    On the tenth day of trial, the trial court was informed that one of the defendants,

6  by his actions/stares had been making some jurors uncomfortable.

7    First the bailiff just advised me that some of the younger jurors,
    without identifying them by name, just indicated to him that they

8    are uncomfortable because of looks that they say the defendant
    Stringer is giving them, and they expressed their discomfort to the

9    bailiff.

10  RT 1157.

11  The trial judge went back to the activities of trial outside the presence of the jury after this

12  announcement, apparently letting counsel think over the problem, RT 1163, and it was agreed to

13  question the juror the next day.  Juror Number 4 complained about Stringer's eye contact with

14  her, and his "body language" in response to reaction to witness testimony,  RT 1166; she did not

15  think she was biased as a result, but she wanted the conduct to stop.  RT 1167.  She had not

16  "discussed" her feeling with other jurors, but had simply heard a comment about it from another

17  juror and felt corroborated in her feeling.  Juror Number 5 related the same problem.  Juror 5 also

18  felt that she had not lost her objectivity.  RT 1169.  Juror 11 repeated the testimony of the two

19  other jurors, except that she had felt *petitioner* was engaging in ostensibly inappropriate eye

20  contact.  RT 1188.   Juror 11 was not offended by the eye contact or concerned; it was more of

21  just a noticeable observation.  RT 1189.  This observation would not affect her ability to be an

22  objective juror.  RT 1188-89.  All testimony revealed that no discussion of these observations

23  had taken place with the other jurors.  A comment had been made by one of the jurors about

24  _____

25    [2]  Because the Court of Appeals did not review aiding and abetting on the "foreseeable consequence" theory, the undersigned will not formally adjudicate it here either.  However, based on the facts of this case, the theories of aiding and abetting not reviewed by the Court of Appeal

26  may well have been stronger.

1   Stringer's mannerisms, and two other jurors related, "me too."  A juror then contacted the bailiff

2   with the concerns of the three jurors.

3          Defense counsel made a motion for mistrial because the jurors had been

4   "discussing the case."  This motion was denied.  The court parceled out the defendants' conduct

5   and the jurors' reactions, and did not believe such on the part of the jurors was misconduct.  RT

6   1195-96.  The court found that the jurors should not have "discussed" the matter with each other,

7   but that the discussion was fairly de minimis.  RT 1197.  The court did relate that it would

8   admonish the jurors about pre-deliberations discussions.  The court then denied defense

9   counsel's motion to strike the affected jurors.  After a question and answer period with one

10  witness outside the presence of the jury, the judge admonished the jury as a whole not to discuss

11  the case prior to deliberations.

12          And I also need to re-admonish all jurors you are not to discuss any
            of the issues involving the case or anything about the case among
13          yourselves or with anyone else, and if you do have a concern about
            something during the trial, you're not to discuss that with any other
14          jurors.  It is appropriate for you to bring it to the bailiff's attention,
            for him to bring it to mine, for me to determine what needs to be
15          done, if anything, about it, but otherwise don't share any of your
            feelings or concerns about any issues with the other jurors.

16  RT 1223-24.

17          The Court of Appeals found that defendants' (Stringer and petitioner's) actions,

18  however characterized were not "juror misconduct."  If defendants had acted inappropriately,

19  those defendants could not profit from their own wrong.  Moreover, to the extent that petitioner

20  and Stringer were claiming that the judge should have interviewed all jurors, a request never

21  made by trial counsel, the appellate court pointed out that the only testimony by the affected

22  jurors was that they had *not* discussed their observations with other jurors, and the trial judge did

23  not abuse his discretion in not questioning all the jurors and moving ahead with the trial.

24  Opinion at 18-19.

25          Petitioner initially claims that she is attacking only the judge's failure to interview

26  all jurors, but she appears to attack the Court of Appeal for lumping her conduct, or lack thereof,

14

1   in with Stringer's.  Petitioner misses the point of her claim herein.  This is not a claim directed at

2   the organizational acumen of the Court of Appeals, but at the possibility of juror bias.  If the facts

3   disclosed by the jurors indicated that petitioner was truly not a part of the juror stare-down, then

4   she could not possibly be prejudiced by having those jurors continue to adjudicate her case.  The

5   jurors' concerns would have only been directed at Stringer.  If, on the other hand, petitioner had

6   engaged in hard looks with the jurors, and there is some mild evidence from Juror 11 that she

7   had, petitioner is not permitted to profit from her own misconduct.  Williams v. Woodford, 384

8   F.3d 567, 627 (9th Cir. 2004).

9          Thus, petitioner's strenuous argument that the jurors had not identified her with

10  any misconduct seems to rob her of standing (prejudice) to complain of the judge's procedures

11  which would then be pertinent only to Stringer's case, i.e., how could petitioner complain that the

12  jurors "discussed" *her* case if she argues that the jurors only complained about Stringer?  But

13  even assuming that petitioner has standing to complain about a discussion about any aspect of

14  any defendant associated with her case, or assuming that the jurors had identified petitioner with

15  some very mild misconduct, petitioner's claim that the trial judge constitutionally erred by not

16  interviewing all jurors is meritless.

17          This case is governed by the on-point discussion of Williams v. Woodford

18  concerning an acting-out defendant.  In Williams, a capital case trial, the defendant had uttered a

19  statement interpreted by a juror as a serious threat.  The court interviewed that juror and the

20  foreperson, but declined to interview the jury as a whole because the foreperson had testified that

21  no discussion had taken place regarding the defendant's conduct until after the verdict had been

22  reached.  The Ninth Circuit found defendant's misconduct not to be "extraneous evidence," and

23  declared that the defendant could not profit from his own misconduct.  That is, a defendant

24  cannot bootstrap his own conduct into a presumption of prejudice.  However, in every such case

25  of defendant misconduct, the trial judge was to "use reasonable means tailored to the particular

26  circumstances of the case to help ensure a fair trial."  Id. at 627.  Of particular interest here, the

1   Ninth Circuit commented that the trial judge had "informed himself of what had occurred and

2   determined that the jury had not discussed any perceived threat by Williams during the jury

3   deliberations." Id at 628.  There was no absolute constitutional requirement set forth that all

4   jurors must be questioned even though the only testimony received indicated that not all jurors

5   were involved.  Petitioner points to no established Supreme Court authority so circumscribing a

6   judge's discretion to size up the problem and act accordingly.  No authority requires the judge to

7   perform idle acts.

8           In this case, there was hardly a "discussion" at all as that term is generally defined.

9   One juror related an observation, and a couple of other jurors to whom the observation was

10  directed said, in essence, "me too."  The observation was then (appropriately) reported to the

11  bailiff, and that was the end of the "discussion."  The trial judge determined that the observant

12  jurors had not been significantly affected by their observations and ruled accordingly.  Trial

13  counsel never asked to have this matter brought in front of other jurors who had not been related

14  to be part of the perception – and wisely so – why relate to these jurors that at least one of the

15  defendants was acting in a threatening manner?   Even habeas hindsight cannot legitimately fault

16  this decision.

17          Finally, even if there were some type of error in not ensuring that all jurors were

18  apprised of the potential threat, given the facts here, petitioner has not advanced any distance in

19  showing that the facts, *as found by the trial judge*, and which have a presumption of correctness

20  in these habeas proceedings, could possibly have constituted actionable prejudice.

21          Clearly, if AEDPA deference has any force, and it does, petitioner cannot claim

22  that the trial court or the Court of Appeals acted unreasonably in light of established Supreme

23  Court authority.

24  *Conclusion*

25          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

26  a writ of habeas corpus should be denied.

1          These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3   days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6   shall be served and filed within ten days after service of the objections.  The parties are advised

7   that failure to file objections within the specified time may waive the right to appeal the District

8   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9   DATED: 6/10/05

10

11                                        /s/ Gregory G. Hollows

                                        _____

12  GGH:gh:035                          UNITED STATES MAGISTRATE JUDGE
    fors0544.157

13

14

15

16

17

18

19

20

21

22

23

24

25

26